**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| STRIPES US HOLDING, INC., | ) | Case No. 18-12388 (CSS) |
| | ) | |
| Debtor in a Foreign Proceeding.[1] | ) | |
| | ) | |

**DECLARATION OF RICHARD HEIS IN SUPPORT OF
CHAPTER 15 PETITION FOR RECOGNITION OF FOREIGN
NONMAIN PROCEEDING AND RELATED RELIEF**

I, Richard Heis, declare as follows:

1.  I am the Chief Restructuring Officer of Steinhoff International Holdings N.V. ("Steinhoff" and together with its subsidiaries, the "Group"). Steinhoff is a global retailer operating in more than 30 countries in Europe, Asia and Africa and is the ultimate parent company of Stripes US Holding, Inc., the debtor in the above-captioned chapter 15 case (the "Debtor"). I am the duly authorized foreign representative of the Debtor (in such capacity, the "Foreign Representative").

2.  I am the former global head of restructuring at KPMG LLP from which I retired in 2017. I joined KPMG in 1983 and became a partner there in 1997. I have over 25 years of experience specializing in financial sector insolvencies, complex cross border reorganizations, and all forms of restructuring and insolvency.

3.  In my capacity as Steinhoff's Chief Restructuring Officer,[2] I am responsible for, among other things, overseeing Steinhoff's restructuring efforts with its

---

[1] The last four digits of the Debtor's Federal Employer Identification Number are 2800. The location of the Debtor's registered office is 1209 Orange Street, Wilmington, Delaware 19801.

[2] I am also a director at Steinhoff Europe AG ("SEAG"), the direct parent of the Debtor.

creditors, including those relating to the Debtor. I have been extensively involved in the restructuring discussions that have culminated in, among other things, the scheme of arrangement (the "Scheme") that is currently pending in proceedings before the High Court (the "English Proceeding"). I have detailed knowledge of, and experience with, the Group's affairs and its creditors, including those of the Debtor.

4. On October 24, 2018, the High Court held a hearing (the "Convening Hearing") at which the High Court entered an order (the "Convening Order") authorizing the Debtor to convene the Scheme Meeting (as defined below) on November 7, 2018. The Scheme and accompanying documents contemplate that the Debtor will seek recognition of the Scheme under chapter 15 of the Bankruptcy Code. To that end, the Convening Order approved my appointment as the "foreign representative" of the Debtor and authorized me to seek chapter 15 recognition of the English Proceeding. Pursuant to that authority, today (the "Petition Date"), the Debtor commenced this chapter 15 case (the "Chapter 15 Case") by filing the *Verified Petition Under Chapter 15 For Recognition of a Foreign Nonmain Proceeding and Related Relief* [Dkt. No. 3] (the "Verified Petition" and together with the Form of Voluntary Petition [Dkt. No. 1], the "Petition")[3] seeking recognition of the English Proceeding as a foreign nonmain proceeding under chapter 15 of the Bankruptcy Code.

5. I submit this declaration in support of the Petition to provide an overview of the Debtor and the Scheme. I have reviewed the Petition, and it is my belief that the relief sought therein is necessary to implement the Scheme, which is a critical component of the broader Mattress Firm restructuring, as described below.

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Verified Petition.

6. Except as otherwise indicated, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of or advisors to the Debtor, or my opinion based upon experience, knowledge, and information concerning the Debtor. I am over the age of 18 and, if called upon, could and would testify to the facts set forth in this declaration. I am authorized to submit this declaration on behalf of the Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.

## BACKGROUND

### I. The Debtor

7. In 2016, Steinhoff acquired the Mattress Firm businesses, the leading U.S. mattress specialty retailer, through the successful completion of a cash tender offer for Mattress Firm Holding Corp.'s then publicly traded stock. Following that acquisition, the Debtor, a newly-formed subsidiary of Steinhoff, became the ultimate U.S. parent holding company of the Mattress Firm entities. As a result of a recent restructuring, all of the common shares of the Debtor are now owned by SEAG but Steinhoff remains the ultimate parent company of the Mattress Firm entities.

8. The Debtor is incorporated under the laws of the state of Delaware and is registered as an overseas company with a place of business in the United Kingdom. SEAG holds all of the common stock of the Debtor (equivalent to approximately 98% of the total share capital of the Debtor). All of the Series A Preferred Stock of the Debtor (equivalent to approximately 2% of the total share capital of the Debtor) is held by certain current or previous management of Mattress Firm. The Debtor and SEAG are indirect subsidiaries of Steinhoff.

9. The Debtor is a holding company which is the indirect shareholder of Mattress Firm, Inc. ("Mattress Firm"), the leading specialty mattress retailer in the United States that currently has approximately 3,200 stores across 49 states and over 9,500 employees. The Debtor's only significant asset is its equity interests in Mattress Firm.

10. The Debtor is the borrower of a $200 million unsecured revolving loan facility ("Facility C") under that certain $4,000,000,000 acquisition facilities agreement dated August 5, 2016 (as amended or restated from time to time, the "Existing Facilities Agreement") between, *inter alia*, the Debtor, SEAG, Steinhoff, Steinhoff Finance Holding GmbH ("SFHG"), Steinhoff Möbel Holding Alpha GmbH ("Möbel"), and Lucid Agency Services Limited as successor to J.P. Morgan Europe Limited, as agent (in such capacity, the "Agent"). The Existing Facilities Agreement is governed by English law and contains a forum selection clause that permits lenders to bring actions against the Debtor in a U.S. court. Steinhoff and SEAG guarantee the Debtor's obligations under Facility C. As of October 22, 2018, approximately $203 million (including interest and utilization fees) was outstanding under Facility C.

11. In addition to Facility C, the Debtor is also the borrower under: (i) an intercompany loan due to Möbel of which approximately $204 million is outstanding; (ii) an intercompany loan due to Möbel of which approximately $2.1 billion is outstanding; and (iii) an intercompany loan due to SEAG of which approximately $912 million is outstanding (together (i) - (iii), the "Intra-Group Loans"). The Intra-Group Loans are governed by an intra-group loan agreement dated September 16, 2016, as amended on December 22, 2017, and is governed by English law and contains a forum selection clause that provides the courts of England exclusive jurisdiction to settle disputes thereunder. The Intra-Group Loans are guaranteed by the subsidiaries of the Debtor, including Mattress Firm and its subsidiaries.

12. The Scheme only affects the lenders under Facility C and does not affect the rights of any holders of the Intra-Group Loans or the holders of the other debt under the Existing Facilities Agreement.

13. The Debtor has several connections to the United Kingdom. Philip Dieperink, the Debtor's Vice President and one of its directors, is based in the United Kingdom and maintains an office in Cheltenham, England from which he conducts business for or on behalf of the Debtor and performs board oversight responsibilities. As a holding company, the Debtor's primary business activities relate to Facility C and the Intra-Group Loans and, more recently, the restructuring of those financing arrangements. The Debtor's external financing arrangements were negotiated with certain lenders through their offices in the United Kingdom. The Debtor's Vice President also participated in the recent negotiations regarding the restructuring of Facility C under the Lock-up Agreement in London. The Debtor also conducts board meetings in the United Kingdom from time to time.[4] The Debtor is registered in the United Kingdom with Companies House.

14. In addition, English law governs all of the Debtor's material liabilities and obligations. For example, each of the Intra-Group Loan and the Existing Facilities Agreement (which together account for all of the Debtor's $3.4 billion in funded indebtedness) is governed by English Law and provides that the courts of England shall have jurisdiction to settle any dispute brought by the Debtor arising out of or in connection with those agreements. Likewise, the Debtor, certain members of the Group, and certain of their respective creditors have entered into the global Lock-up Agreement to restructure the obligations of the Debtor and the broader

---

[4] The Debtor's management is comprised of Steve Stagner as President, Philip Dieperink as Vice President, Hendré Ackermann as Vice President and Treasurer, and Kindel Elam as Secretary.

Group.  The Lock-up Agreement was negotiated by Debtor and the Debtor's creditors in the United Kingdom, and the Lock-up Agreement itself is governed by English Law.   The Lock-up Agreement contemplates that an English scheme of arrangement in respect of the Debtor may be required to implement the global restructuring.

## II.     Background to and Objectives of the Scheme

### A.     The Steinhoff Restructuring

15. In December 2017, Steinhoff announced that information had surfaced relating to certain accounting irregularities that required further investigation.[5] In consultation with Steinhoff's auditors (Deloitte), Steinhoff engaged PricewaterhouseCoopers Advisory Services (Pty) Ltd. ("PwC") to conduct that investigation, which remains ongoing.  Until PwC completes its investigation, Steinhoff cannot publish its full-year audited consolidated financial statements for 2016 or 2017.  These events precipitated a downgrade by Moody's Investors Service of Steinhoff's issuer rating and of SEAG's senior unsecured notes rating and brought about a significant decline in Steinhoff's share price, resulting in serious liquidity constraints throughout the Group.  Since December 2017, the Group has relied on funds generated by its South African operations and a series of non-core asset sales to support short-term liquidity needs.  However, the Group concluded that those solutions were not sustainable for its global business, particularly given the ongoing liquidity needs of the Group's European finance companies and international operating companies.

---

[5] At the same time, Steinhoff announced that the management board had accepted with immediate effect the resignation of former CEO, Markus Jooste.  Shortly thereafter, Steinhoff's chairman, Christo Weise, resigned, and Heather Sonn was appointed as acting chairperson of the supervisory board of Steinhoff.  Since December 2017, five new independent supervisory directors were appointed to Steinhoff's supervisory board, and a new governance, social and ethics committee was formed to improve governance throughout the Group.  Steinhoff also appointed several new directors to Steinhoff's management board, and Mr. Heis, the Foreign Representative in this chapter 15 case, was appointed as the Group's chief restructuring officer.

16. In an effort to find a permanent solution to the long-term financial stability of the Group and to alleviate short-term cash flow needs, the Group initiated discussions with key creditor groups to formulate a viable plan to restructure the Group's financial indebtedness. Following extensive negotiations with creditors of the Debtor and SEAG and SFHG – the two principal European finance companies within the Group – the Group announced on July 11, 2018 that it had reached an agreement with ad hoc committees of creditors of the Debtor, SEAG and SFHG on the key terms of a restructuring of the Group's financial indebtedness that was memorialized in a Lock-up Agreement dated July 11, 2018 (the "Lock-up Agreement"). In connection with that announcement, the Group launched a consent process for the Lock-up Agreement, which became effective on July 20, 2018.[6] The Lock-up Agreement imposes agreed limited recourse and standstill obligations on the consenting creditors that will facilitate the implementation of the Group's global restructuring.

### B. The Mattress Firm Chapter 11 Cases

17. Separately, Mattress Firm and certain affiliates and subsidiaries (the "Mattress Firm Debtors") needed to undergo their own restructuring. The Mattress Firm Debtors have underperformed over the past 18 months due to several factors including: (i) over-penetration in certain markets as a result of historical acquisitions and rapid growth; (ii) the accelerated rebranding of over 1,300 legacy Sleepy's and Sleep Train stores to the Mattress Firm banner; (iii) ineffective marketing; (iv) the termination of the supply arrangement with its then largest supplier; and (v) merchandising strategies and sales promotions that negatively impacted profitability. Mattress Firm was also experiencing a liquidity crisis, and covenants in Mattress

---

[6] As of October 18, 2018, the Lock-up Agreement was acceded to by (i) lenders holding in excess of 90% of the outstanding obligations under Facility C, (ii) creditors holding in excess of 90% of SEAG's external financial indebtedness and (iii) creditors holding in excess of 95% of SFHG's external financial indebtedness.

Firm's existing financing documents restricted its ability to incur debt to finance its ongoing operations. The combination of these factors negatively impacted profitability and increased liquidity pressures on Mattress Firm's business.

18. Following consideration of various turnaround initiatives, on October 5, 2018 (the "MF Petition Date"), the Mattress Firm Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court jointly administered under case number 18-12241 (CSS). On the same day, the Mattress Firm Debtors filed a joint prepackaged chapter 11 plan (the "Chapter 11 Plan") to implement a restructuring that will, among other things, provide the Mattress Firm Debtors access to debtor-in-possession financing to support the Mattress Firm Debtors' business. The Mattress Firm Debtors also anticipate rejecting leases for certain underperforming stores during their chapter 11 cases, which will help the Mattress Firm Debtors optimize their retail footprint.

19. To facilitate the successful implementation of the Chapter 11 Plan, the Mattress Firm Debtors have secured commitments from certain creditors of the Group to provide a $400 million senior secured exit term loan facility (the "Exit Term Loan"). The Mattress Firm Debtors have also secured commitments from Barclays Bank plc to provide a $125 million asset-based revolving credit facility (the "Exit ABL," and together with the Exit Facility, the "Exit Financing"), which is expected to be undrawn on the effective date of the Chapter 11 Plan. The Exit Financing will be used, among other things, to repay Mattress Firm's existing secured debt, to fund distributions under the Chapter 11 Plan, to pay claims, fees and expenses arising in the chapter 11 cases and associated with the Exit Financing and to fund Mattress Firm's working capital needs post-emergence. The Exit Financing is an essential component of the Chapter 11

Plan and is necessary in order for the Mattress Firm Debtors to successfully and quickly emerge from chapter 11.

20. The terms of the Exit Financing contemplate that the lenders under the Exit Financing will receive equity interests in, and PIK debt issued by, the Debtor in exchange for the Exit Financing. However, the lenders under the Exit Financing require the Debtor to be released or discharged from its obligations in relation to the Intra-Group Loans and Facility C as a condition precedent to closing on the Exit Financing. To facilitate this, SEAG and Möbel as intra-group creditors have agreed to contribute their claims under the Intra-Group Loans to the capital of the Debtor.[7] Those contributions will result in the elimination of all obligations of the Debtor in respect of the Intra-Group Loans.

C. The Scheme[8]

21. The Scheme is necessary to release the Debtor's obligations with respect to Facility C prior to the effective date of the Chapter 11 Plan. Under the Scheme, the Facility C lenders (the "Scheme Creditors") will transfer all of their rights, title and interest in Facility C to SEAG in return for their pro rata share in a new revolving credit facility provided by SEAG (the "New SEAG Facility," and the transfer, the "Exchange"). The terms of the New SEAG Facility will be substantially similar to Facility C as to its economic terms and the obligations of Scheme Creditors. The principal amount owed to a Scheme Creditor under the New SEAG Facility will be the same as the aggregate amount of (i) the principal and interest (including default interest) due and unpaid under the Existing Facilities Agreement in relation to Facility C as of September 28, 2018 and (ii) the utilization fees due and unpaid under the Existing Facilities

---

[7] The guarantees of the Intra-Group Loans provided by certain of the Mattress Firm Debtors will be released.

[8] In the event of any conflict or inconsistency between the description of the Scheme contained herein and the provisions of the Scheme, the provisions of the Scheme shall govern.

9

Agreement in relation to Facility C as of August 8, 2018 owed to such Scheme Creditor. As additional consideration for the Exchange, each Scheme Creditor will also receive its pro rata share of $100,000 which will be payable by Steinhoff based on the amount of each Scheme Creditor's Facility C holdings.

22. The Scheme Creditors will also be required to release (i) all claims against the Debtor under the Existing Facilities Agreement and the "Finance Documents" as defined in the Existing Facilities Agreement and all claims against Steinhoff or SEAG in relation to Facility C and (ii) all claims (other than claims for fraud or willful misconduct) against the Debtor, Steinhoff, SEAG, the Agent under Facility C, Lucid Issuer Services Limited as information agent (the "Information Agent") under the Scheme and any other Scheme Creditor from any liability arising out of or in connection with the negotiation, preparation, implementation, execution or consummation of the Scheme (the "Releases"). Following the Exchange, SEAG, as sole lender under Facility C, will contribute the receivables under Facility C to the capital of the Debtor, reducing the amount outstanding under Facility C to zero. Immediately following the contribution, Facility C will be cancelled.

23. Absent the Exchange and the subsequent contribution and cancellation of the Facility C debt, the Exit Term Loan will be available to the Mattress Firm Debtors only if the exit term lenders are satisfied "in their sole and absolute discretion" with the results of their diligence into the potential tax impacts of an alternative structure in which the equity and PIK debt would be issued by indirect Debtor subsidiary Mattress Holdco, Inc. instead of the Debtor. Because that alternative structure is contingent upon the exit term lenders' satisfaction with the results of their tax diligence, the Exchange contemplated by the Scheme provides greater certainty that the Mattress Firm Debtors will be able to satisfy the conditions precedent to the

Exit Financing requiring the release of the Debtor's Facility C obligations so that the Debtor can issue equity and PIK debt as contemplated by the Exit Financing. Chapter 15 recognition is essential to ensure that the Scheme will be recognized and enforced within the territorial jurisdiction of the United States.

24. As a result of obtaining certain consents under the Lock-up Agreement, the Scheme has the support of 30 of 32 (94% by number) of Scheme Creditors holding over 90% of Facility C claims by value, which exceeds the statutory thresholds for approval of the Scheme under English law. In order to implement the Scheme, on October 10, 2018, the Agent published the practice statement letter (the "PSL") on a document management platform on the Debtdomain website and distributed it by email to all creditors that the Debtor believed were or may be Scheme Creditors. On October 22, 2018, the Debtor filed an application under part 26 of the Companies Act 2006 of England and Wales, thereby commencing the English Proceeding and requesting that the High Court approve the Debtor's request to convene a meeting (the "Scheme Meeting") of the Scheme Creditors.[9] On October 23, 2018, the Information Agent notified the Scheme Creditors of the date, time and location of the convening hearing (the "Convening Hearing") regarding the Scheme. The Agent published the Scheme and related documents on the Debtdomain website on October 24, 2018.

25. To ensure the successful implementation of the Scheme, the Debtor also commenced this chapter 15 case to obtain recognition of the English Proceeding as a foreign nonmain proceeding and recognition of the Scheme and the Sanction Order (including the Releases contained therein) in the United States. I believe that chapter 15 recognition is

---

[9] The Scheme Creditors include each Lender who has a Facility C Commitment (each as defined in the Existing Facilities Agreement) to be a "creditor" of the Debtor for the purposes of the Scheme.

11

essential to ensure that the Scheme will be recognized and enforced within the territorial jurisdiction of the United States.

### D. My Appointment as Foreign Representative of the Debtors

26. On October 18, 2018, by written resolution, the board of directors of the Debtor authorized me to act on behalf of the Debtor as the Debtor's Foreign Representative in its Chapter 15 Case.

27. On October 24, 2018, the High Court authorized me to act as the Foreign Representative of the Debtor in respect of the Scheme in any case under chapter 15 of the Bankruptcy Code to obtain recognition of the Scheme as a "foreign nonmain proceeding" and to take any and all actions to execute, deliver, certify, file, record and perform under any and all documents, agreements, instruments, certificates, petitions, motions, affidavits, or applications for approvals or rulings of governmental or regulatory authorities, and to take any and all steps deemed by the Foreign Representative to be necessary or desirable to carry out the purpose and intent of the Scheme including, without limitation, filing any petition or motion for recognition of the Scheme under chapter 15 of the Bankruptcy Code, the enforcement of any order of the English Court presiding over the Scheme (including the Convening Order and the Sanction Order), and any other related relief under chapter 15 of the Bankruptcy Code.

## RECOGNITION AND OTHER RELIEF REQUESTED

28. The English Proceeding, the Scheme (including the Releases contained therein) and the Sanction Order comport with English law and, I am advised by U.S. counsel, satisfy the requirements for recognition and enforcement under chapter 15 of the Bankruptcy Code. Recognition of the English Proceeding, enforcement of the Scheme (including the Releases) and the Sanction Order within the territorial jurisdiction of the United States and the

Injunction against creditor actions in the United States that are inconsistent with the Scheme (the "Injunction") are critical to ensure that the Scheme can be implemented without disruption or the threat of adverse actions by dissenting creditors against the Debtor or its assets in the United States. Without assistance from this Court, the Scheme and the Sanction Order could be fundamentally undermined to the detriment of all parties in interest. I believe that the interests of all Scheme Creditors are aligned with the Debtor in obtaining recognition of the English Proceeding, enforcement of the Scheme (including Releases) and the Sanction Order within the territorial jurisdiction of the United States and approval of the Injunction to ensure that the Scheme is implemented successfully.

29. I have also requested that the Court cause the Proposed Order to become effective immediately upon entry notwithstanding the 14-day stay of effectiveness of that order. I believe that a waiver of the 14-day stay of effectiveness period is appropriate in these circumstances to allow the Debtor to proceed immediately with the implementation of Exchange which will to allow the Mattress Firm Debtors' Chapter 11 Plan to go effective in the timeframe contemplated.

30. I have also filed a motion requesting that the Court schedule a recognition hearing and approve the form and manner of notice to Scheme Creditors. The relief requested in that motion is necessary to ensure that all interested parties receive proper notice of the chapter 15 case and the proposed recognition hearing, which I am requesting take place on the same day as the confirmation hearing on the Mattress Firm Debtors' Chapter 11 Plan. Given the importance of the Scheme to the Mattress Firm Debtors' restructuring, I submit the relief requested in the scheduling motion is necessary and appropriate and in the best interests of the Debtor, its creditors and all other parties in interest.

I certify under penalty of perjury under the laws of the U.S. that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: October 24, 2018  
       London, England

/s/ *Richard Heis*  
Richard Heis  
Foreign Representative of the Debtor

Chief Restructuring Officer of  
Steinhoff International Holdings N.V.