## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 15 |
| | ) |
| STRIPES US HOLDING, INC., | ) Case No. 18-12388 (CSS) |
| | ) |
| | ) |
| Debtor in a Foreign Proceeding.[1] | ) |
| | ) |

## DECLARATION OF RICHARD DAVID HODGSON IN SUPPORT OF
## VERIFIED PETITION UNDER CHAPTER 15 FOR RECOGNITION OF
## A FOREIGN NON-MAIN PROCEEDING AND RELATED RELIEF

I, Richard David Hodgson, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America, as follows:

1.      I am a solicitor duly admitted to practice in England and Wales and a partner in the law firm of Linklaters LLP, located at One Silk Street, London, EC2Y 8HQ United Kingdom.  I submit this declaration (the "Declaration") in support of the *Verified Petition of the Foreign Representative Seeking Entry of a Final Order Granting Recognition of a Foreign Non-Main Proceeding and Related Relief* [Dkt. No. 3] (together with the Form of Voluntary Petition filed contemporaneously herewith, the "Petition") filed in the above- captioned chapter 15 case.[2] The Petition seeks, among other relief, chapter 15 recognition of a scheme of arrangement (the "Scheme") proposed by Stripes US Holding, Inc. (the "Debtor") to its Scheme Creditors (as defined in paragraph 2 below) under part 26 of the Companies Act 2006 of England & Wales (the "Companies Act") to the extent that such Scheme is duly approved by the requisite majority of Scheme Creditors and sanctioned by the High Court, all in accordance with applicable English

---

[1]      The last four digits of the Debtor's Federal Employer Identification Number are 2800. The location of the Debtor's registered office is 1209 Orange Street, Wilmington, Delaware 19801.

[2]      Capitalized terms used but not defined herein shall have the meaning ascribed in the Petition.

law.  As of the date hereof, the Scheme is pending before the High Court of Justice, Chancery Division, Companies Court sitting in London, England (the "High Court").

2.      The Debtor is a direct subsidiary of Steinhoff Europe AG ("SEAG"), with Steinhoff International Holdings N.V. ("Steinhoff") as the ultimate corporate parent (together with its direct and indirect subsidiaries, the "Group").  The Debtor is the borrower of a $200 million unsecured revolving loan facility ("Facility C") under that certain $4,000,000,000 acquisition facilities agreement dated August 5, 2016 (as amended or restated from time to time, the "Existing Facilities Agreement") between, *inter alia*, the Debtor, Steinhoff, SEAG, Steinhoff Finance Holding GmbH ("SFHG"), Steinhoff Möbel Holding Alpha GmbH ("Möbel"), and Lucid Agency Services Limited as successor to J.P. Morgan Europe Limited, as agent (in such capacity, the "Agent").  The Existing Facilities Agreement is governed by English law and contains a forum selection clause that permits lenders to bring actions against the Debtor in a U.S. court.  Steinhoff and SEAG guarantee the Debtor's obligations under Facility C.  As of October 22, 2018, approximately $203 million (including interest) was outstanding under Facility C.

3.      The purpose of the Scheme is to implement an exchange that will enable the release of the Debtor's obligations under Facility C, which is governed by English law.  To accomplish this, the lenders under Facility C (the "Scheme Creditors") will transfer their rights in Facility C to SEAG in return for their pro rata share in a new debt instrument (the "Exchange") issued by SEAG as borrower (the "New SEAG Facility").  That Exchange, as implemented by the Scheme, is a critical component of the exit financing provided to Debtor subsidiary Mattress Firm, Inc. and its debtor affiliates (together, the "Mattress Firm Debtors") in connection with their recently filed prepackaged chapter 11 cases.  The terms of the exit

A37511012

financing contemplate that the lenders under the exit financing will receive equity interests in, and PIK debt issued by, the Debtor in exchange for the exit financing.  However, the lenders under the exit financing require the Debtor to be released and discharged from its obligations under Facility C and certain other outstanding intra-group debt as a condition precedent to closing on the exit financing.

4.      Absent the release of the Facility C debt under the Scheme, the exit term loan will be available to the Mattress Firm Debtors only if the exit term lenders are satisfied "in their sole and absolute discretion" with the results of their diligence into the potential tax impacts of an alternative structure in which the equity interests and PIK debt would be issued by indirect Debtor subsidiary Mattress Holdco, Inc. instead of the Debtor.  Because that alternative structure is contingent upon the exit term lenders' satisfaction with the results of their tax diligence, the Exchange contemplated by the Scheme provides greater certainty that the Mattress Firm Debtors will be able to satisfy the conditions precedent to the exit financing by releasing the Debtor of its Facility C obligations so that the Debtor can issue equity and PIK debt as contemplated by the exit financing.  Thus, the sanctioning of the Scheme and chapter 15 recognition is a critical step that will facilitate the Mattress Firm Debtor's expeditious emergence from chapter 11 and ensure that the Scheme will be recognized and enforced within the territorial jurisdiction of the United States.

5.      In this Declaration, after describing my background and qualifications, I provide a description of English law and practice relevant to this Court's consideration of the Petition.  I also wish to advise this Court of the procedures and schedule of events relating to the Scheme.

6.      In preparing this Declaration, I have reviewed (a) the Petition and (b) relevant provisions of the Companies Act, the Insolvency Act 1986 (the "Insolvency Act") and other

relevant provisions of English and EU law as I consider may relate to chapter 15 and other aspects of U.S. bankruptcy law.

## I.    PROFESSIONAL BACKGROUND AND QUALIFICATION

7.    Relevant aspects of my legal background are as follows: I earned my undergraduate degree in Law (LL.B) from The London School of Economics and Political Science in 1998.  I undertook my solicitor's training contract with the firm of Denton Wilde Sapte (now Dentons) between 1999 and 2001 and was admitted to practice as a solicitor of the higher courts of England and Wales on September 3, 2001.  I am a partner in the Restructuring and Insolvency group in the London office of Linklaters LLP and have concentrated on international and cross-border restructuring and insolvency legal practice since my qualification in 2001.

8.    I have considerable experience in matters related to English insolvency law.  In particular, I have advised debtors, creditors and insolvency practitioners in a significant number of formal insolvency proceedings, out-of-court restructurings and other related matters, including regarding the proposal of schemes of arrangement under the Companies Act.

9.    I, together with other partners and associates in my firm, have been advising the Debtor, SEAG and other members of the Group on legal aspects of the restructuring of the financial indebtedness of the Group since December, 2017.[3]

## II.    STATEMENTS ON ENGLISH LAW AND PRACTICE

10.    A scheme of arrangement is a proceeding under the laws of England and Wales (part 26 of the Companies Act) that allows a company to effect compromises or arrangements, including by way of restructuring debt liabilities with their members (i.e. shareholders) or

---

[3]    The information concerning the Scheme provided herein is drawn either from public documents or from my personal knowledge.  Furthermore, I have not relied on any confidential attorney-client communications or on confidential documents prepared in anticipation of litigation.

creditors (or any class of them).  One of the uses for schemes of arrangement is the restructuring of debts of companies that are in financial distress.  Schemes of arrangement are particularly useful because they enable companies and their creditors in certain instances to obtain court sanction to effect restructuring measures without having to obtain approval from 100% of affected creditors.  Such schemes of arrangement are often referred to as 'creditor schemes' to distinguish them from schemes of arrangement relating to shareholders ('member schemes').  As the Scheme proposed by the Debtor relates only to certain classes of its creditors, the remainder of this Declaration will refer to schemes of arrangement only in that context.

11.     Sections 895 to 899 of the Companies Act permit a 'compromise or arrangement' (commonly, a 'scheme of arrangement' or 'scheme') to be proposed between a company and its creditors or any class of them.  Attached hereto as **Exhibit A** is a true copy of Sections 895 to 899 of the Companies Act.  A scheme of arrangement must be a genuine and effective arrangement or compromise.  There must be some sort of advantage gained by those creditors of the company that participate in the scheme of arrangement that compensates them for the alteration of their rights.[4]  A proposal that simply seeks to expropriate the rights of creditors cannot be a compromise or arrangement within the meaning of the Companies Act.  Moreover, a proposed scheme must benefit creditors based on their collective rights, rather than benefit any single creditor alone.

12.     A creditor scheme can be initiated by the company applying to the High Court in England for permission to convene a meeting of the relevant creditors whose rights will be affected to consider and vote on whether to approve it.  The hearing to consider this application is commonly referred to as the 'convening hearing.'  In accordance with the Practice Statement

---

[4]     Here, Scheme Creditors will receive an aggregate amount of $100,000 in proportion to the amounts owed to them under Facility C, from the Debtor's ultimate parent Steinhoff International Holdings N.V., as a guarantor thereunder, in addition to their share of the New SEAG Facility.

of the High Court dated April 15, 2002, the company should give notice (through a "Practice Statement Letter") of the intended promotion of the scheme of arrangement to all such creditors to give them the opportunity to attend the initial hearing to raise any objections related to the proposed classification of the affected creditors or any issues relating to the jurisdiction of the High Court to hear the scheme of arrangement.  Following commencement of the Scheme, the High Court sitting in London, England is authorized under the Companies Act to supervise the English Proceeding.

13.      In the present case, the Agent published the Practice Statement Letter ("PSL") on a document management platform on the Debtdomain website and distributed it by email to the Scheme Creditors on October 10, 2018.[5]  The PSL notified creditors of their right to attend court hearings regarding, and raise objections to, the Scheme.[6]

14.      On or about the date hereof, Scheme Creditors are being provided with copies of relevant documentation, including documentation setting out the Debtor's determination of their voting rights in relation to the Scheme and the releases contemplated by the Scheme (as described in further detail below).

15.      Classification of the affected Scheme Creditors is an important consideration for the High Court.   Each class of Scheme Creditors is required to approve the Scheme in accordance with the relevant statutory majority provided for under the Companies Act (as to which, see paragraph 21 below).  Classification is based on similarity or dissimilarity of legal rights against the Debtor, both as they exist before the Scheme and afterwards.  Classification is

---

[5]      The Debtor has also provided notice of the Scheme and a copy of the PSL to the lenders under the B1, B2 and B3 Facilities under the Existing Facilities Agreement (the "Facility B Lenders").  While the Facility B Lenders are not Scheme Creditors, the Debtor considered it prudent to bring the Scheme to their attention as they are also subject to the Existing Facilities Agreement.

[6]      A copy of the PSL is attached hereto as **Exhibit B**.

not based upon a similarity of economic interests or objectives.  Scheme Creditors whose rights are so dissimilar that they cannot sensibly consult together with a view to their common interest must be placed into separate classes for voting purposes and must be given separate meetings to consider and vote on the Scheme.

16.    Each of the Scheme Creditors has materially the same rights against the Debtor. In addition, if the Scheme becomes effective in accordance with its terms, the existing rights of each Scheme Creditor against the Debtor will be replaced with substantially similar rights against SEAG.  Accordingly, all Scheme Creditors will be members of a single class.[7]

17.    A single meeting will be convened for the purposes of considering, and, if the Scheme Creditors think fit, approving the Scheme (the "Scheme Meeting").  Scheme Creditors will be allocated voting rights in proportion to the amount of their claims under Facility C.

18.    When deciding whether to give permission to convene a meeting (or meetings) of creditors pursuant to a proposed scheme of arrangement, the High Court will also consider whether it has jurisdiction over the company concerned pursuant to the Companies Act.  Section 895(2)(b) of the Companies Act provides that any company liable to be wound up under the Insolvency Act can be the subject of a scheme of arrangement.  The High Court will also consider whether there is any reason why it should not exercise its discretion to order the convening of the requested meeting(s), for example by reference to reasons of public policy.

19.    In the present case, the Debtor, which is incorporated in Delaware, is eligible to be wound up in England under the Insolvency Act as an unregistered company and is subject to the jurisdiction of the High Court under Part 26 of the Companies Act.  The High Court has

---

[7]    The Debtor has not separately classified those Scheme Creditors that have acceded to the Lock-up Agreement because, among other reasons, the Scheme will affect the rights of each Scheme Creditor in the same way, regardless of whether the Scheme Creditor acceded to the Lock-up Agreement.

jurisdiction to sanction the Scheme on the basis that the Debtor has a sufficient connection to England and Wales.  In particular, the High Court has jurisdiction because the Existing Facilities Agreement is governed by English law.  Further, if and to the extent that Chapter II of the Recast Judgments Regulation applies to the Scheme, the High Court has jurisdiction to sanction the Scheme under Article 8 thereof because a sufficient number of the Scheme Creditors, both in number and by value, are domiciled in England and Wales.

20.    Once permission to convene meetings of creditors pursuant to a proposed scheme of arrangement has been granted by the High Court, the company to which the scheme of arrangement relates will then send notice of the meetings and an explanatory statement (which will include the terms of the proposed scheme of arrangement) to the affected creditors. Section 897 of the Companies Act sets out what information must be contained in the explanatory statement.  Like a disclosure statement in a chapter 11 case, the explanatory statement must contain a sufficient explanation of the effects of the scheme of arrangement for a typical creditor affected by the proposal to be able to make a reasonable decision about whether or not to support it.  It also describes the releases being provided under the Scheme.  After an appropriate period approved by the High Court, the meetings will be held.

21.    In the present case, notice of the Scheme Meeting and an explanatory statement explaining the terms of the Scheme (including the relevant releases) are being sent to Scheme Creditors on or about the date hereof.  All Scheme Creditors have the right to vote on such Scheme at the Scheme Meeting convened by order of the High Court.

22.    For a scheme of arrangement to become effective, a majority in number representing not less than 75% in value of those creditors who are present and voting at the meeting convened to consider the scheme of arrangement must vote in favour of the proposal.

Creditors do not need to attend the meeting in person (although they may do so) and will be able to appoint the chairman or another person as a proxy to vote on their behalf.

23.     The voting tally is not required to be scrutinised or confirmed by an independent third party (it being the duty of the chairman to report to the High Court on the outcome of the meeting).  Richard Heis (the Debtor's Foreign Representative) or, if he is not available, I will chair the Scheme Meeting.

24.     If a meeting (or series of meetings) of creditors convened to consider a proposed scheme of arrangement results in the approval of the proposal by such creditors, the company concerned will apply for the High Court to sanction the scheme of arrangement at a further hearing (commonly known as the 'sanction hearing').  The explanatory statement is required to include the proposed date for the sanction hearing, and the High Court will publish the hearing times of cases heard before it on its website.  Creditors and other interested persons may appear in person or by counsel and be heard, raise objections and present evidence at the sanction hearing.

25.     The sanction hearing is not a mere formality.  The High Court has discretion as to whether to sanction any proposed scheme of arrangement, and it can hear arguments at this stage both from creditors whose rights would be affected by the arrangement and from other persons whose rights are not affected but who claim they would be prejudiced by the scheme of arrangement if it were sanctioned.  In particular, the High Court will examine whether (a) the Companies Act requirements have been satisfied, (b) the creditors subject to the proposed scheme of arrangement were fairly represented by those who attended the meeting and the requisite majorities are acting in good faith and are not coercing the minority in order to promote interests that are collateral or different from those of the class of affected creditors in general,

and (c) the arrangement is such that an intelligent and honest person who is a member of the class of affected creditors and acting in respect of his own interest might reasonably approve.

26.     When considering whether to sanction a scheme of arrangement, the High Court will not substitute its own commercial view on the terms of the proposal for the views of the affected creditors.  This is on the basis that the High Court considers that such commercial decisions are best made by those whose commercial interests are at stake.  If the High Court thinks that ulterior motives influenced the approval, it may decide not to sanction the scheme of arrangement.  However, if the scheme of arrangement appears to the High Court to be ostensibly fair, then the High Court will not otherwise judge its commercial merit.

27.     Once sanctioned by the High Court, a scheme of arrangement will become effective when a certified copy of the High Court's order approving it is submitted to the Registrar of Companies for England and Wales (subject to the provisions of the scheme of arrangement itself).  All affected creditors will be bound by the scheme of arrangement whether or not they were given notice of the scheme, participated in the meeting or voted in favour of the proposal.  In the present case, if the Scheme Creditors vote to approve the Scheme at the Scheme Meeting, then it is proposed that the sanction hearing will take place on or around November 12, 2018.

28.     If the Scheme is sanctioned, certain releases will take effect.  The specific releases provided for by the Scheme are, excluding any rights, title and interest that have been transferred to SEAG pursuant to the Scheme:

> a.   a full release of all claims of each Scheme Creditor against the Debtor pursuant to the Existing Facilities Agreement and the "Finance Documents" as defined in the

Existing Facilities Agreement and any claims regarding any liability of SEAG or Steinhoff in relation to Facility C;

b.   a full release of all claims (other than claims for fraud or willful misconduct by any party) of each Scheme Creditor and its successors and assignees against the Debtor, Steinhoff, SEAG, the Agent, Lucid Issuer Services Limited as information agent and any other Scheme Creditor in relation to:

  i.   the negotiation, preparation, implementation or consummation of the Scheme, the New SEAG Facility or the other documents that implement the Scheme (together, the "Implementation Documents"); and

  ii.   the execution of the Scheme, the Implementation Documents or any other documents, steps or actions necessary or desirable to implement the Scheme, provided, however, that the release does not in any way impair or prejudice any rights of any Scheme Creditor arising under any Implementation Document (including as a result of non-compliance with the terms of any Implementation Document) or any remedy in respect of these rights.

29.    It is commonplace for schemes to provide for scheme creditors to release claims. Here, the releases are necessary to the Scheme because they form an integral part of the bargain between the Debtor and the Scheme Creditors to achieve a consensual resolution of the parties' rights.   As stated above, at the sanction hearing, creditors and other interested persons may present evidence and raise objections to the Scheme, including the releases.

30.     The convening hearing took place before the High Court on October 24, 2018 and the High Court entered an order (the "<u>Convening Order</u>") authorizing the Debtor to convene the Scheme Meeting on November 7, 2018.

## III.    <u>CONCLUSION</u>

31.     In conclusion, for the reasons stated herein and in the Petition, I respectfully request that the Petition for recognition of the English Proceeding as a foreign non-main proceeding and for related relief be granted in its entirety, together with such other and further relief as this Court deems just and proper.

*[Signature Page Follows]*

A37511012

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:      October 24, 2018


_/s/ Richard Hodgson_
Richard Hodgson
_Partner, Linklaters LLP_

A37511012